IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

NICHOLE LOVE,                          )
                                       )
        Plaintiff,                     )         Civil Action No. 5:20-cv-00070
                                       )
v.                                     )
                                       )         By: Elizabeth K. Dillon
CPT. TODD LLOYD, et al.,               )             United States District Judge
                                       )
        Defendants.                    )

**MEMORANDUM OPINION**

Plaintiff Nichole Love alleges that while in the custody of the Middle River Regional Jail ("MRRJ"), she was sexually assaulted by a male inmate, even though there was a "keep separate" order that applied to them. Thereafter, she claims that she was involuntarily placed in administrative segregation in retaliation for reporting the assault. She complains about certain conditions during her brief stay in segregation. She further asserts claims based on a lack of mental health treatment.

As described in the court's opinion addressing a prior motion to dismiss, Love filed her initial complaint as a *pro se* plaintiff, although she apparently was assisted by an attorney who indicated he would represent her yet failed to do so. The original suit named as defendants the Middle River Regional Jail Authority ("MRRJA"), former Jail Superintendent Jack Lee, Captain Todd Lloyd, Lieutenant Rickie Maddox, and "other unknown jail officers." (Compl., Dkt. No. 1.) Subsequently, and after Love obtained counsel, she filed amended complaints that added some defendants, removed some (including MRRJA and former Superintendent Lee), and altered her claims. In an opinion and order entered in July 2023, the court concluded that claims against the later-added defendants were time-barred, and it dismissed those defendants. (Dkt. Nos. 102, 103.)

Only two defendants remain in the case—Cpt. Todd Lloyd and Lt. Rickie Maddox. Although they were not involved in the events immediately preceding the assault, they became involved afterward, investigating the allegations and taking other actions challenged by Love. Love asserts the following claims against them both: a First Amendment retaliation claim; an Eighth Amendment claim of deliberate indifference; a Fourteenth Amendment substantive due process claim; and a common-law gross negligence claim.

Lloyd and Maddox have filed a joint motion for summary judgment (Dkt. No. 90), which is ripe for disposition.  In their motion, they assert that the undisputed facts establish that they did not violate any of Love's constitutional rights and all of her § 1983 claims must be dismissed.  They also argue that even if a constitutional violation could be established, they are entitled to qualified immunity.  They further contend that her state-law claim is time-barred.

In her opposition, Love concedes that her Fourteenth Amendment claim should be dismissed.  Because she was a convicted prisoner at the time of these events, her claim is properly brought under the Eighth Amendment.  She also concedes that her gross negligence claim is time-barred.  (Opp'n to Mot. for Summ. J. ("Opp'n") 23–24, Dkt. No. 94.)  Thus, the court need analyze only her First and Eighth Amendment claims.

For the reasons set forth herein, the court will grant in part and deny in part defendants' motion.  Specifically, the court will grant summary judgment in defendants' favor as to Love's Eighth Amendment claim and will deny it as to her First Amendment retaliation claim.

## I.  FACTUAL BACKGROUND

Based on the parties' submissions, the following facts are either undisputed or are viewed in the light most favorable to Love, the non-moving party, unless otherwise noted.

**A. Love Is Sexually Assaulted By a Fellow Inmate While in MRRJ Custody, and the Assault Is Reported to MRRJ Officers.**

Love and Kristopher Wingfield began their incarceration at MRRJ in or around June 2018. A keep separate note was entered in MRRJ's offender management system on June 29, 2018. After a court appearance in Bath County, both Love and Wingfield were brought back to MRRJ at 12:05 p.m. on October 17, 2018. At the time, Love was a convicted inmate. Love alleges that neither she nor Wingfield was handcuffed or otherwise restrained. Thus, although they were directed to sit on separate benches, they could move freely within the intake area. At one point, Love went to the bathroom, which did not lock. Wingfield followed her into the bathroom and sexually assaulted her for two minutes.[1] Love did not immediately report the incident to MRRJ staff but called her mother, who then called and reported the incident, at Love's direction, to Officer Swan, a female officer.

Love was placed in a holding cell by Officer Swan who spoke to her about the assault at that time. Swan told Love that she would "lock him down" and she would send somebody to speak with Love. However, Wingfield came to Love's cell and taunted her for 30 seconds through the cell door. Her cell was locked, and he could not get inside. Thereafter, Officer Swan and another officer came to her cell, gave her Miranda warnings, and had her write a statement.

Lloyd and Maddox were not present during the assault and had no involvement in the circumstances that led to the assault.[2] Their involvement began after Lloyd received Love's report of a sexual assault and then performed the initial investigation into the incident. Lloyd

---

[1] Wingfield was convicted of this assault. (Love Dep. 65–66.)

[2] In sworn declarations, Lloyd and Maddox state that at the time of the assault, they did not have any prior or contemporaneous awareness of the presence of either Love or Wingfield at the facility, the existence of the keep separate order, or of Love's medical or mental health history. Love presents nothing to dispute these assertions.

also became the sole point of contact for persons calling into MRRJ with questions or concerns about Love.  (Opp'n Exs. F, G, Dkt. Nos. 94-6, 94-7.)  For example, Love's aunt called MRRJ twice and was transferred to Lloyd's voicemail.  In a report documenting one of the calls, the aunt inquired why Love was being "punished" for reporting the assault by being placed in administrative segregation.  (Opp'n Ex. G.)  At the time, Lloyd was a captain; Maddox was an administrative lieutenant at MRRJ tasked with providing assistance with Lloyd's investigation.[3] (Maddox Decl. ¶ 1, Dkt. No. 94-3.)

Upon learning of the incident in intake, Lloyd directed that Love be brought to a major's office for an interview.  The interview details are in Lloyd's report.  (Defs.' Mem. Ex. B, Dkt. No. 91-2, at 18–19.)  Maddox was present for the interview.  After the interview, Lloyd and Maddox arranged for Love to be transported to the local hospital's emergency room for medical treatment and evidence collection.  Love acknowledges that she was sent to the emergency room and while there, testing with a rape kit was performed.  When Love returned from the hospital that evening, Lloyd and Maddox were not at the facility.

**B.  Love Is Placed in Administrative Segregation.**

Lloyd made the decision to have Love temporarily placed in administrative segregation upon her return from the hospital, and Maddox "assisted with the implementation of the decision."  (Lloyd Decl. ¶ 6, Dkt. No. 91-2; Maddox Decl. ¶ 5.)  During her initial interview with

---

[3] Love insists that both Maddox's position and his responsibilities are in dispute, noting that on different documents, Maddox's signature appears above different titles, including Security Supervisor, Security Lieutenant, Captain on Duty, and Watch Commander.  (Opp'n 3, Exs. A–E, Dkt. Nos. 94-1 to 94-5.)  But the court concludes that these disputes are not material because they do not inform what Maddox actually knew or did, nor does Love explain how they would alter the analysis of her claims.

Lloyd, Love was told that she would be placed in segregation.[4]  She was told that it was "for [her] safety," and that "classification wasn't [present at MRRJ] to classify [her] and put [her] back into regular population."  (Love Dep. 55:11–15, Dkt. No. 94-12, at 2.)[5]

Consistent with what they told her, Lloyd and Maddox state in their declarations that Love was placed in segregation for her own protection.  Lloyd explains that administrative segregation is used for protective custody and that "[s]egregation was the safest and most secure area for her until the investigating officers could get a handle on what had happened and determine that her release into general population was safe."  (Defs.' Mem. Support of Mot. Summ. J. ("Mem.") 4, Dkt. No. 91 (citing Lloyd Decl. ¶ 7).)  Defendants also point out that segregation cells have cameras and a call button.  Thus, they allow for closer monitoring than a general population cell in the event of an emergency, including medical or mental health crises.  Also, the segregation cells are next to the medical department and mental health and are used for medical and mental health overflow when needed.

Defendants emphasize that inmates in administrative segregation have the same access to services and privileges as inmates in general population.  Love, however, disputes this

---

[4]  According to her opposition brief, Love told Lloyd and Maddox that she did not want to go into protective custody, but she was not given another option, nor was she informed of any process for her to challenge her placement in segregation.  (Opp'n 7 (stating that she "inform[ed] both Lloyd and Maddox that she did not wish to be placed into segregation and felt such action to be punitive in nature," but neither defendant offered any other option or informed her of a right to refuse segregation).)  Notably, the opposition does not point to any evidence in the record to that effect.

[5]  This is the exchange at those lines: "Q. Did they explain to you why they were putting you in segregation? A. Yeah.  It was procedure and it was for my safety, and classification wasn't there no more to classify me and put me back into regular population."  (Love Dep. Tr. at 55:11–15.)  Inexplicably, Love's opposition includes the following description of this same testimony: "Ms. Love testified at her deposition that she believed and understood the change in housing to be punitive in nature.  *See* [Love Dep. Tr.] at 55:11–15."  Neither party has provided the entirety of Love's deposition, so the court does not know whether somewhere else she testified to that effect, but the cited testimony does not match Love's description of it.

characterization, at least as it relates to her experience in segregation.[6]  Indeed, in her

interrogatory responses, she states that an officer informed her that she was not allowed to

shower or to have access to her personal items while in segregation.  (Pl.'s Resp. to Interrog. No.

8, Dkt. No. 95-3, at 7.)  Instead, she was given only sheets, a blanket, a toothbrush, and soap.

(*Id.*)  She emphasizes that she felt "dirty" from the assault and that her clothes still had the dye

from the rape kit on them.  Love also argues that she has a history of mental health problems and

that placement in segregation was likely to exacerbate them, particularly immediately after

enduring a sexual assault.

    In addition to challenging the conditions she endured, Love contends that her placement

in segregation was retaliation for her reporting the assault.  In her original verified complaint, she

implies that she expressed a similar belief shortly after the events at issue.  There, she stated that

she filed a grievance after her release from segregation and then stated that "the officers treated

[her] like it was all her fault, and punished [her] by placing her in 'lock down' for no reason."

(Compl. 5, Dkt. No. 1.)  Although it is unclear from the complaint whether her grievance was

related to that statement or related to other issues, the court has reviewed the grievances she

submitted with her opposition.  The closest she comes to alleging that her segregation was

punitive is a grievance where she complains about being "thrown in seg. with none of [her]

things" and states that because Wingfield was not sent to segregation—and was able to keep his

personal belongings—MRRJ was giving preferential treatment to males over females.  (Pl.'s

Exs. T, AA, Dkt. Nos. 95-4, 95-11.)

**C. Love Attempts Suicide in Her Cell, But Because She Wants to be Released to General Population, She Tells Staff That She Just Wanted Attention.**

---

[6] Although Love complains in her opposition that no recordings were produced in discovery from that camera, she acknowledged in her deposition that the segregation cell had a camera and call button.  (Love Dep. 57.)  Thus, she does not dispute that the cell offered closer monitoring than cells in general population.

Love alleges that she had previously been diagnosed with PTSD and clinical depression. There is no evidence that Lloyd and Maddox were aware of her history, though, and they deny it. They also aver that as non-medical staff at MRRJ cannot access inmates' medical and mental health records. However, Lloyd expected that "mental health" would check on Love sometime the next day and that, if she experienced a mental health emergency before then, she would receive immediate intervention and medical attention.

The morning after being placed in segregation, Love was very depressed and so ripped a bed sheet and tied it around her neck, tightening it, in an attempt to kill herself. (Love Dep. 58–59.) The first notice Maddox received about Love on October 18 was around 1:00 p.m.[7] He heard a call over the radio of a possible emergency in segregation, and he responded to the call. (Maddox Decl. ¶ 9.) Upon his arrival, it was reported to him that Love had wrapped a sheet around her neck that she was tightening herself and which did not need to be cut. Love was conscious when the officers arrived to assist her, and the nurse immediately assessed her upon arrival, reporting that she was not injured. (*Id.*; Love Dep. 60.)

While Maddox and Love waited for mental health staff to arrive to evaluate her, Love testified that Maddox and another "tall guy" looked at her and started laughing and they told her that if she needed their attention, she did not "have to do that."[8] (Love Dep. 60.) Maddox also advised Love that if she did not tell the mental health person that she tried to kill herself only for attention, then they would "take [her] clothes and put [her] in the turtle suit or a smock" and that she would "be in segregation a lot longer." (Love Dep. 61; *see also* Maddox Decl. ¶ 10 (describing that he advised Love of the suicide protocol at MRRJ which includes procedures of placing the inmate in a suicide smock in a stripped cell to prevent self-harm).) Love admitted in

---

[7] Lloyd was not aware of or involved with responding to Love's suicide attempt.

[8] Maddox denies that he laughed at Love. (Maddox Decl. ¶ 10.)

her deposition that she believes the information given to her was accurate, but she believed that Maddox did not "care[]" and was just trying to pressure her to say she did not really intend to kill herself. (Love Dep. 61–62.)

Samantha Judy, a licensed professional counselor, arrived to evaluate Love, and Love told her that she just wanted to get out of segregation, and that she "did it for attention." (*Id.* at 64.) Mental health staff made the decision that Love could be returned to general population and did not need to be placed on suicide protocol. She was released from segregation on October 18, 2018, at 14:55. (Maddox Decl. ¶¶ 10–12.)

**D. Love Is Provided Some Mental Health Treatment.**

After the assault, Love confirmed that she continued to receive her mental health medications that had been previously prescribed to her. However, she complains that an unidentified guard conveyed to her that she would see mental health staff once per week, and that did not happen. Instead, she saw mental health professionals only "two times," although it is unclear whether Love means she was seen two times *in addition to* the time when counselor Judy evaluated her immediately following her suicide attempt, or *including* that occasion. (Love Dep. 31–32, 35.) As to the only other counseling appointment she testified about, Love said she complained to sheriff's office staff about a lack of counseling sessions when meeting with them to discuss the assault and charges against Wingfield. She believes the second counseling session was held in response to that complaint, after the sheriff's office called over to MRRJ and conveyed her complaint. (Love Dep. 35.)

In any event, it is undisputed that the first time she was treated was immediately following her attempted suicide, as already discussed. At that time, counselor Judy concluded that Love was not a suicide risk and cleared her for general population. As part of this initial session, Judy completed a "safety plan" with Love. (Opp'n Ex. Q, Dkt. No. 95-1.) The plan

stated that Love would continue taking her mental health medications, attend "crisis stabilization sessions with [mental health] staff as needed, and . . . reach out to jail staff" if she needed assistance. (Opp'n Ex. Q.) The plan also stated that Judy would follow up with Love the next day, 10/19/2018, and "provide crisis stabilization sessions for two to three weeks, or as needed." (*Id.*) Lastly, it referenced that Love should attend a future appointment with Dr. Jana.

The appointment with Dr. Jana was not scheduled until nearly two months later, on or about December 21, 2018, but that was the day Love was released, so she did not attend the appointment. (Lloyd Decl. ¶ 19.)

As to counseling visits, Lloyd claims that he reviewed Love's medical records in conjunction with the litigation, pointing out that they contain references to five visits on five different dates. (Lloyd Decl. ¶ 18.) Love counters that a close examination of those records reflect that certain treatment notes from multiple appointments are identical, word-for-word, and contain inaccuracies as to the dates relevant to other events. She suggests that these notes strongly suggest that at least two of those visits did not actually occur. (Opp'n 10–13, Dkt. No. 94.) Moreover, she points to her own testimony about only receiving two counseling sessions.[9]

The court agrees that those records call into question whether all of those appointments actually occurred. Instead, then, the court credits Love's deposition testimony that she was only seen by mental health care providers twice in between the time of the assault and her release from MRRJ two months later. (Lloyd Decl. ¶ 19 (noting Love was released from MRRJ custody on December 21, 2018).)

As to whether Lloyd or Maddox had any contemporaneous knowledge that she was not receiving adequate mental health care, the court will address this issue in detail in the context of

---

[9] Love testified that the first of these was "directly" after her suicide attempt. (Love Dep. 31.) Again, it is not clear if she was referring to the day of the attempt, or the counseling session reflected in the notes from the following day. (*See* Opp'n Ex. W (treatment notes dated October 19, 2018, Dkt. No. 95-7).)

analyzing her claim.  *See infra* Section II.C.2.

## II.   DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).[10]  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

### B.  Section 1983 Claims

"To state a claim under § 1983[,] a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017).  In their summary judgment motion, defendants contend that the undisputed facts

---

[10]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.

show that they have not violated Love's constitutional rights.

## C. Eighth Amendment Deliberate Indifference

Love asserts two different claims under the Eighth Amendment. First, she complains that she was placed in segregation after a sexual assault and was denied a shower, not permitted to change her stained clothes, and was refused access to certain of her personal items for about a day. Second, she alleges that she was denied adequate mental health treatment following her attempted suicide.[11]

### 1. Conditions-of-confinement claim

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). But "the Constitution does not mandate comfortable prisons," *id.* at 349, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347. Instead, it is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

To plead an Eighth Amendment conditions-of-confinement claim requires facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In evaluating the first element with regard to a condition-of-confinement claim, a court

---

[11] Defendants also address, albeit briefly, a purported claim that Love was delayed in getting her mental health treatment after the assault. (Mem. 14.) The court does not construe Love as asserting such a claim, and the opposition does not address such a claim. Notably, though, Love was sent nearly immediately to the hospital and although she was not seen by anyone back at MRRJ that day, at most there was a day delay in any mental health treatment from the time of the assault. Love points to no evidence that Lloyd or Maddox had reason to know that she was at any risk of serious or significant injury if she did not receive treatment until the day after the assault.

must evaluate the conditions in light of contemporary standards of decency, keeping in mind that the Eighth Amendment only prohibits "extreme deprivations."  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).  To demonstrate that the conditions are "extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," or "demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions."  *Id.*

To establish the second element of her claim, Love must show that the defendant was personally aware of facts indicating a substantial risk of serious harm and that the defendant actually recognized the existence of such a risk.  *See, e.g., Farmer*, 511 U.S. at 838–840; *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994).  Love also must show that the defendant subjectively recognized that his actions were inappropriate in light of that risk.  *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

As noted, Love alleges that she was denied a shower, clean clothes, and her personal hygiene items for a period of less than 24 hours after returning from the hospital.  These conditions, while unfortunate and no doubt uncomfortable, do not satisfy the objective prong of an Eighth Amendment claim, as many courts, including this one, have explained.  *E.g., Davenport v. DeRobertis*, 844 F.2d 1310, 1316–17 (7th Cir. 1988) (holding that allowing inmates in a segregation unit only one shower per week was "constitutionally sufficient" and did not constitute an Eighth Amendment violation); *Johnson v. McCoy*, No. 7:19-CV-00005, 2021 WL 1113377, at *8 (W.D. Va. Mar. 23, 2021) (collecting authority holding that even periods as long as a week of being denied a shower or clean clothes did not give rise to an Eighth Amendment violation).

The court recognizes that being deprived of the opportunity to bathe following a sexual

12

assault and use of a rape kit is more onerous than just the deprivation of a single shower. Nonetheless, Love has not shown that an actual injury occurred or that she faced a substantial risk of a serious physical or emotional injury. Thus, and consistent with the foregoing cases, the court concludes that Love has failed to state a claim under the Eighth Amendment with regard to being denied a shower, clean clothes, or hygiene products for such a short period. Because she cannot establish the first element of the claim, her conditions-of-confinement claim under the Eighth Amendment fails.

Her claim also fails because there is no evidence that either of these defendants had notice of such conditions at any point *before* her release from segregation. Love points to possible phone calls from her family, but she does not allege that anyone actually spoke with Lloyd before her release from segregation or that he received any of those voicemails, and there is no evidence he did. This undisputed lack of actual awareness by either defendant means Love also cannot establish the second prong of a conditions claim.

### 2. Deliberate Indifference to Love's Mental Health Needs

Love's second Eighth Amendment claim alleges that she was denied adequate mental health treatment, that Lloyd and Maddox knew of the inadequate treatment, and that they failed to take reasonable steps to ensure she received adequate treatment.

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). This includes serious mental health needs. *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("[C]ourts treat an inmate's mental health claims just as seriously as any physical health claims.").

To prove this claim, Love must show that (1) she has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention"; and (2) the defendant "had actual knowledge of [her] serious medical needs and the related risks, but nevertheless disregarded them." *Gordon*, 937 F.3d at 356–37; *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

The parties dispute many aspects of this claim. First, the court will assume that Love could establish the first element of her claim. There is sufficient evidence from which a jury could conclude that she had a serious mental health need, including that: (1) she was prescribed and currently taking mental health medications; (2) she attempted suicide after the assault; and (3) her "safety plan" immediately following the suicide attempt required follow-up counseling— at least "as needed"—and a follow-up doctor's appointment. Thus, she had a diagnosed mental health condition.

Second, for purposes of the summary judgment and as already noted, the court credits Love's testimony that she only received two mental health visits during the two-month period in between the assault and her release from custody.

Third, the court turns to the second element's requirement that Lloyd and Maddox have actual knowledge of her serious medical needs. First of all, Love was not certain whether or not she ever filed such a grievance. (Love Dep. 34–35.) Regardless, none were ever produced in the case, and, given her uncertainty, the court treats as undisputed the testimony by Lloyd and Maddox that they never received a written grievance from Love complaining about a lack of mental health treatment.[12] Indeed, they explained that it would be atypical for them to receive

---

[12]   Somewhat misleadingly, in the context of arguing that Maddox and Lloyd had knowledge she was not receiving adequate mental health treatment and that she had pre-existing mental health needs, Love refers to written grievances she submitted, noting that the two defendants reviewed them and responded to them. (Opp'n 14 (citing Pl.'s Exs. Z, AA, BB, CC (grievance forms, including one signed by Maddox on October 22, two signed by Maddox on October 31, and one signed by Lloyd on October 29)).) Those grievances reference the assault and officers' failure to follow the keep separate order (Exs. Z, BB, CC), as well as the fact that she was placed in segregation while Wingfield was not and that she was not given an opportunity to shower while in segregation (Ex. AA). None of them refer to a lack of mental health treatment or any deviation from the safety plan put in place by counselor Judy.

such a grievance, because grievances about a lack of medical care or mental health care are generally handled by the medical department.  (Lloyd Decl. ¶ 15; Maddox Decl. ¶ 16.)

In her interrogatory responses, though, Love stated that, during an October 29, 2018 meeting with Lloyd and Maddox discussing the investigation into her sexual assault, she informed both Lloyd and Maddox of the inadequacy of her mental health treatment.  (Pl.'s Resp. to Interrog. 9, Dkt. No. 95-3, at 8; *cf. also* Pl.'s Ex. CC (grievance response from Maddox referring to an October 29, 2018 meeting).

Defendants insist that this conflicts with Love's sworn testimony and they cite to the well-known rule that a plaintiff cannot create a genuine issue of material fact by contradicting herself.  (Defs.' Reply at 7 (citing *Jessup v. Barnes Grp., Inc.*, 23 F. 4th 360, 367 (4th Cir. 2022), and *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997)).)  And they point to the fact that Love described certain other communications with each of them at her deposition, but then said she could not recall any others.  (Love Dep. 65–66.)  Apparently, the ones she recalled did not include her complaining about a lack of mental health treatment.[13]  As an initial matter, it is unclear that the deposition and interrogatory responses conflict—a statement that a person does not recall any other meetings during her deposition does not necessarily conflict with an earlier statement that such a meeting occurred.

But particularly because the court resolves this claim in defendants' favor regardless, the court will assume, without deciding, that Love complained to Lloyd and Maddox about inadequate mental health care in a single meeting.  Nonetheless, her claim still fails.

First of all, if Love wanted to receive medical services, the method for doing so was to submit a request for medical services, and it appears that she never did so.  She testified several

---

[13]   The entire deposition transcript was not produced, so when counsel asked her whether she recalled having any other conversations "other than what we've talked about today," (Love Dep. 66), the court does not know what else has been "talked about today."

times that she knew that was the process for obtaining medical services.  (Love Dep. 24–25, 33.)
Had she complained to Lloyd or Maddox, their likely response would have been to tell her to file
a medical request.  Moreover, because it is undisputed that they never received a written
grievance from her, Lloyd and Maddox had no occasion to investigate her allegations.

But even assuming that she complained to them in a single meeting about a lack of
counseling visits to that point (approximately eleven days after the assault), that is insufficient to
establish deliberate indifference on the facts here.  First of all, a non-medical provider cannot be
held liable for a failure to provide an inmate medical treatment where, as here, that inmate is
under the care of health-care providers for the ailment or injury.  *Miltier v. Beorn*, 896 F.2d 848,
854 (4th Cir. 1990) (holding that non-medical personnel are entitled to rely on the professional
judgment of medical practitioners to determine appropriate treatment for a patient), *abrogated on
other grounds by Farmer*, 511 U.S. 825; *see also Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir.
2008)  (reasoning that "'[i]f a prisoner is under the care of medical experts . . . , a nonmedical
prison official will generally be justified in believing that the prisoner is in capable hands'").
Here, the undisputed testimony is that both Lloyd and Maddox do not control or supervise the
medical or mental health staff and that they both rely upon those trained professionals to make
the appropriate professional judgments as to the necessary treatment.  (Lloyd Decl. ¶ 17; Maddox
Decl. ¶ 17; *see also* Love Dep. 35–36 (acknowledging that she has no information that either
Lloyd or Maddox controlled or supervised the medical department).

As she admits, Love did receive some mental health care, including mental health
medications and an evaluation immediately following her suicide attempt.  Thus, this case is
distinguishable from cases, such as *Iko*, 535 F.3d  at 242, where a prisoner received *no* health
care.  In *Iko*, a nurse came to see the plaintiff, but then did not examine him at all after he failed
to give an audible response.  The defendant officers were present and aware of the lack of

treatment, and they then observed the plaintiff collapsing, but kept him restrained and in his pepper-spray saturated clothing and spit mask. *Id.* at 232. The Fourth Circuit concluded that the officers could not rely on the nurse's apparent decision not to treat the plaintiff in those circumstances.

Here, some treatment was being provided. Moreover, there is no evidence that they could have taken steps to require additional care or treatment by medical staff. Indeed, all evidence is to the contrary. In short, Love cannot seek to hold two persons responsible who had no control over what mental health services were provided to her. Instead, this falls squarely within the general rule that non-medical personnel are entitled to rely on medical personnel with regard to what treatment is required for an inmate. Her Eighth Amendment deliberate indifference claim against these non-medical defendants thus fails.

Lastly, to the extent Love's claim is based on any allegation that Maddox "laughed at her" or was uncaring about either the assault or her suicide attempt, that does not state a claim under the Eighth Amendment. *Henslee v. Lewis*, 153 F. App'x 178, 179 (4th Cir. 2005) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983."). *See also Morva v. Johnson*, No. 7:09-cv-00515, 2011 WL 3420650, at *7 (W.D. Va. Aug. 4, 2011) (collecting authority for the proposition that "[v]erbal harassment or idle threats to an inmate, even to an extent that it causes an inmate fear or emotional anxiety," do not give rise to a due process violation or an Eighth Amendment violation).

For all of the foregoing reasons, defendants are entitled to summary judgment on Love's Eighth Amendment claim.

## C. First Amendment Retaliation[14]

In her retaliation claim, Love alleges that her placement in administrative segregation after she reported the sexual assault was retaliatory action in violation of the First Amendment.[15] To succeed on a retaliation claim, Love must establish that "(1) she engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendant's conduct." *Martin v. Duffy ("Martin II")*, 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy ("Martin I")*, 858 F.3d 239, 249 (4th Cir. 2017)). Notably, however, the Fourth Circuit has cautioned that courts must treat an inmate's claim of retaliation by prison officials "with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). Where an inmate bases his § 1983 claim on nothing more than a conclusory assertion of retaliation, that claim may be dismissed. *Adams*, 40 F.3d at 74–75.

As to the first element of the claim, complaining and filing a report about a sexual assault while in prison is protected First Amendment activity. *Cf. Martin I*, 858 F.3d at 249 (holding

---

[14] Love has named both defendants as to her retaliation claim. Although it appears undisputed that Lloyd was the decisionmaker on this issue, and Maddox merely assisted with implementation, defendants' motion does not seek summary judgment in Maddox's favor on the ground that he did not make the decision to place her in administrative segregation. Accordingly, at least for summary judgment purposes, the court considers the two defendants together.

[15] In her interrogatory responses, Love also claims that she "believes she was subjected to undue harassment in the form of pretextual shake-down searches and write-ups for the remainder of her incarceration at MRRJ," claiming that these actions were retaliatory. (Pl.'s Resp. to Interrog. No. 13, Dkt. No. 95-3, at 10; *see also* Opp'n 8). Notably, she does not attribute any of these shake-down searches or writeups to either Lloyd or Maddox, she does not describe them in any more detail (such as by date or as to what occurred), and she does not offer any argument about them in the brief. The court thus deems Love to have abandoned any retaliation claim based on anything other than her placement in segregation. *See Duffey v. Wal-Mart Stores East LP*, No. 8:19-CV-665-TMC, 2021 WL 62163 (D.S.C. Jan. 7, 2021) (finding party abandoned certain portions of claims by failing to address them in his summary judgment briefing). In any event, they fail because she has pointed to no evidence showing either of these defendants was involved in those events.

that filing a grievance complaining about a sexual assault by a guard was First Amendment activity). Defendants do not argue to the contrary. (Mem. 9–10.) Defendants contend, though, that Love has failed to put forth sufficient evidence to establish the second or third elements of a retaliation claim. The court disagrees.

With regard to the second element, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). In *Martin II*, the court held that the plaintiff's placement in administrative segregation could satisfy the second element. Defendants argue that the facts here involved a *temporary* placement in administrative segregation, lasting less than 24 hours, while the plaintiff in *Martin* was held in segregation for 110 days. Defendants also insist that Love had access to the same services and privileges as inmates in general population, and better access to medical and mental health services, so placement in segregation would not chill First Amendment activities.

To be sure, the adverse action suffered by the plaintiff in *Martin* went on for a longer period of time. But defendants' argument on this point ignores key parts of the record. Perhaps most importantly, Love has testified—based on personal knowledge—that the conditions in administrative segregation are more onerous than in general population. On summary judgment, the court must credit her testimony on this point. Further, and although the court has concluded that her conditions of confinement in segregation did not violate the Eighth Amendment, those conditions must be considered when determining whether her placement there would chill speech.

Significantly, Love had just been sexually assaulted and taken to a hospital, where a rape kit was used, leaving her with dye on her clothing. Then, she was kept in the cell without being

allowed to clean herself, without being given clean clothes, and without any cellmate or others to communicate with about the traumatic experience she just endured.  Considering all of those circumstances together, a reasonable jury could conclude that the action was sufficiently adverse to chill protected activity.

Defendants also point out that Love continued to exercise her First Amendment rights by pursuing her complaint against Wingfield.  The standard for whether an action is sufficiently adverse is objective, rather than subjective, but the fact that a plaintiff has not been deterred from continuing in her protected activity is a factor that the court can consider in assessing the second element.  *Id.* at 500 (noting that, although it is not dispositive, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity").  Nonetheless, on balance, the court concludes that there is sufficient evidence in this case from which a reasonable jury could find Love has established the second element of the retaliation claim.

The third element of a retaliation claim requires a plaintiff to show a causal connection between the triggering First Amendment activity and the alleged adverse action.  A plaintiff must put forth evidence to show that her "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action."  *Martin II*, 977 F.3d at 300.  *Martin II* is again instructive.  There, like here, the inmate was placed in segregation after making a complaint of sexual assault, and the defendant (Duffy) stated that the placement was not intended as punishment but "to protect the integrity of the investigation" and to ensure the inmate's "safety and protection."  *Id.* at 305.  In their declarations, both Lloyd and Maddox have stated that Love was placed in administrative segregation "for her safety and protection."  (*See* Lloyd Decl. ¶ 7; Maddox Decl. ¶ 6.)

Like *Martin II*, then, this is a "unitary event" case, in which the plaintiff's protected

conduct is a single event (a report of sexual assault) that could prompt either a permissible or an impermissible reason on the part of the defendant to act.  In such a case, and on summary judgment, the focus is on whether a reasonable factfinder could conclude that defendants acted for an impermissible reason.  *Martin II*, 977 F.3d at 303 (citing *Greenwich Citizens Comm. v. Ctys. of Warren & Wash. Indus. Dev. Agency*, 77 F.3d 26, 33 (2d Cir. 1996)).

In *Martin II*, the district court had granted Duffy's motion for summary judgment on the retaliation claim, and the Fourth Circuit reversed.  The appellate court noted that Duffy's affidavit was, at times, inconsistent and that he failed to identify any specific threats to either Martin's safety or the integrity of an investigation.  *Id.*  Here, of course, there was a specific threat to Love—Wingfield.  But like the plaintiff in *Martin II*, Love identifies some arguable inconsistencies between defendants' stated motive and the contemporaneous evidence.

For example, she points to the fact that on her October 18, 2018 segregation log, in the section labeled "Status," the category "Investigation" was circled—even though there was also an option for "Inmate Safety" (*see* Dkt. No. 94-11).  On the same log, there was a section to denote "assault risk" or "enemies," but both are marked as "No."  (*Id.*)  Second, the classification form completed by Maddox to authorize Love's placement in segregation provided only "[i]nmate placed in Seg under investigation.  She made claims that she was sexually assaulted" (Dkt. No. 94-3).  Additionally, even after defendants reviewed video evidence showing Wingfield following Love into the unlocked restroom, they did not relocate Wingfield to segregation.  (*See* Dkt. No. 94-15 (incident report by Maddox stating that Wingfield would not be relocated).)

Indeed, no one has explained why Love (and not Wingfield) was placed in administrative segregation pending completion of the investigation.  Certainly, placing Wingfield in segregation also would have aborted any threat to Love by him and kept her safe from him.  This, too, at

least calls into question whether Love's safety was the true motivation for defendants' placing her in segregation.

The court notes that, throughout her opposition memorandum, Love relies heavily on standards set forth in the Prison Rape Elimination Act ("PREA"), 42 U.S.C. §§ 15601–15609, including a provision that discourages placing the victim of an assault in segregation unless there are no other alternatives.[16]  (Opp'n 6.)  Her reliance is misplaced, and the court has not considered PREA in making its decision.

Defendant Lloyd avers that MRRJ had not "adopted" the PREA standards at the time of these events and that MRRJ does not train its officers on that statute.  (Lloyd Suppl. Decl. ¶ 1, Dkt. No. 96-1.)  According to the PREA Resource Center, the standards apply even to locally operated facilities.[17]  But even if they did or should apply, because Lloyd asserts the MRRJ had not adopted PREA standards and he and other officers were not trained on it, a failure to comply with those standards has no bearing on what *their* motivation was in placing Love in segregation.

In short, as to defendants' motivation, the court recognizes that there is not an abundance of information suggesting that retaliation was their motive.  But in cases of retaliatory intent or discriminatory intent and motive, there is rarely going to be "smoking gun" type of evidence. *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84–85 (2d Cir. 1990) (noting same in discrimination case); *Clere v. GC Servs., L.P.*, No. 3:10-CV-00795, 2011 WL 2181176, at *6 (S.D.W. Va. June 3, 2011).  And the facts discussed above are "significantly probative such that

---

[16]  She also points to two purported MRRJ policies, but neither of them were in effect at the time of these events. (*See, e.g.*, Pl.'s Ex. N, MRRJ Standard Operating Procedure 5.3, Dkt. No. 94-14 (effective date of June 6, 2022).)  Thus, those policies are not relevant to her claims.

[17]  *See*, PREA Resource Center, "FAQ," https://www.prearesourcecenter.org/frequently-asked-questions/do-standards-apply-locally-operated-facilities (last visited Mar. 19, 2024) (explaining that "PREA standards apply equally to locally operated facilities, such as lockups, jails, juvenile detention centers, and locally operated residential community confinement facilities" although for "local facilities not operated by the state, PREA provides no direct federal financial penalty for not complying"); *see also* 42 U.S.C. § 15609(7) (defining "prison" to include "any confinement facility of a Federal, State, or local government").

a reasonable factfinder considering all of the evidence" could find that defendants violated Love's First Amendment rights. The court will therefore deny summary judgment as to this claim.

## D. Qualified Immunity

The court also has considered defendants' contention that they are entitled to qualified immunity. (Mem. 16–17 (explaining the relevant standards and citing, among other cases, *S.P. v. City of Takoma Park*, 134 F.3d 260, 265 (4th Cir. 1998).) As to the First Amendment claim, they argue that no reasonable officer would know that "in the absence of any retaliatory motive or animus, the temporary placement of a recently assaulted inmate in administrative segregation *for less than 24 hours* would violate any clearly established right." (Mem. 17 (emphasis in original).) That may be true, but that presupposes that there was an "absence of retaliatory motive or animus." Here, as the court already has explained, there are disputes of fact on that issue. The same disputes of fact that preclude summary judgment on the retaliation claim also preclude finding prior to trial that defendants are entitled to qualified immunity. Thus, the court will deny defendants' motion for summary judgment on qualified immunity grounds.

## III. CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part the motion for summary judgment (Dkt. No. 90). The motion is denied as to Love's First Amendment claim against Maddox and Lloyd and granted as to all other claims.

The court will issue an appropriate order.

Entered: March 27, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

23